E-FILED
Friday, 08 June, 2018  12:09:53 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

ANDREW MINIK, JOEL VALDEZ, and
BLAIR NELSON,

          Plaintiffs,

vs.

(1) BOARD OF TRUSTEES OF THE
UNIVERSITY OF ILLINOIS, including
RAMON CEPEDA, DONALD J. EDWARDS,
PATRICK J. FITZGERALD, STUART C.
KING, TIMOTHY KORITZ, EDWARD L.
MCMILLAN, JAMES D. MONTGOMERY,
SR., JILL B. SMART, TRAYSHAWN M.W.
MITCHELL, KARINA REYES, EDWIN
ROBLES, and GOVERNOR BRUCE
RAUNER, (2) TIMOTHY KILLEEN, President
of the University of Illinois, in his official
capacity, (3) ROBERT J. JONES, Vice-
President of the University of Illinois and
Chancellor for the University of Illinois
Urbana-Champaign campus, (4) RONY DIE,
Assistant Dean of Students of the University of
Illinois at Urbana-Champaign, in his official
capacity; (5) TARIQ KHAN, Graduate
Instructor in his official and individual capacity,

          Defendants.

Case No.  2:18-cv-02101-CSB-EIL

**MEMORANDUM OF LAW SUPPORTING**
**UNIVERSITY DEFENDANTS' MOTION TO DISMISS**

Defendants Board of Trustees of the University of Illinois, including Ramon Cepeda,

Donald J. Edwards, Patrick J. Fitzgerald, Stuart C. King, Timothy Koritz, Edward L. McMillan,

James D. Montgomery, Sr., Jill B. Smart, Trayshawn M.W. Mitchell, Karina Reyes, Edwin

Robles, and Governor Bruce Rauner; Timothy Killeen, President of the University of Illinois;

Robert J. Jones, Vice President of the University of Illinois and Chancellor for the University of

Illinois Urbana-Champaign; and Rony Die, Assistant Dean of Students (collectively "University

Defendants"), by their attorneys, Hinshaw & Culbertson LLP, submit this memorandum in support of their Motion to Dismiss.

## NATURE OF ALLEGATIONS

Plaintiffs are students at the Urbana-Champaign campus of the University of Illinois. (¶¶11, 12, 13).[1]  They identify as "mainstream conservative[s]" and as campus journalists for "Campus Reform," "who seek to report on, engage with, discuss and debate political, social, cultural, and moral issues on and around the University."  ¶¶14, 15.  Campus Reform reports on liberal "bias and abuse" on college campuses.  ¶15; Ex. D.

Khan is a graduate student at the University and has been an instructor there.  ¶¶19, 28. He is also a member of an "extreme left-wing" organization known as the "Black Rose Anarchist Federation" or "Black Rose." ¶21.

On November 16, 2017, Black Rose held a protest on campus against President Trump's policies.  ¶27.  Valdez and Nelson attended the protest. ¶27.  It is unclear whether they attended as reporters for Campus Reform or as activists for a conservative political organization known as Turning Point USA (also known as "TPUSA").  Ex. D.

At some point during the event, Kahn directed remarks to Valdez and Nelson: "…F@#k you guys….  I'm going to go tear down one of your flyers right now." ¶28.  As Minik described it, Valdez responded by "mock[ing]" Kahn (Ex. D):  "No one is scared of you 50 year old man. Don't you have kids to look after?"  ¶29.  An "altercation" ensued (¶¶30, n. 1; 32; 48; 65).

Khan viewed Valdez's comment ominously, "accus[ing] Valdez and Nelson of 'threatening his kids.'" ¶30.  Khan placed himself "chest to chest" with Valdez, took Valdez's

---

[1]     Paragraph marks (¶) and "Ex." refer to the corresponding parts of the Complaint unless otherwise indicated.

301961412v1 1008237

phone, and threw it on the ground. ¶¶ 31, 32.  Khan was subsequently charged with criminal

damage to property (¶33).  The University took no action against Khan.  ¶35.

Two days later, Minik published an article about the altercation on the website of

Campus Reform.  ¶34; Ex. D.  Minik reported that Khan was arrested for assault, theft, and

criminal damage to property.  He described it as beginning "as a demonstration to air

grievances," but turning into a "violent altercation" when Khan's "speech targeted TPUSA:"

> Joel Valdez, executive board member and campus activism
> coordinator for TPUSA, asked, "Don't you have anything better to
> do?  Don't you have kids?"

Ex. D.

## The No Contact Directives

Khan reported the altercation and ensuing Minik article to the University and he

requested the no contact directives. ¶38.  Under the *Student Code* and the *Student Disciplinary*

*Procedures*,[2] the University Disciplinary Officer (DO) is authorized to make findings of fact

regarding violations of the *Student Code* and impose any discipline, sanction, or restriction

except suspension or dismissal.  University Ex. 2, §2.01(e); §2.02(d), (g).  Restrictions may be

imposed as described in §2.04(c)(ii) of the *Student Disciplinary Procedures*:

> The student is restricted from certain activities on campus (*e.g.*
> participation in certain registered student organizations, intramural
> or varsity athletics; contact with specific people or physical
> locations; or other restrictions deemed just and appropriate).

---

[2]     Section 1-301(j) of the *Student* Code, attached to the Complaint as Exhibit M, provides that alleged
violations are resolved through the *Student Disciplinary Procedures,* located at www.conflictresolution.illinois.edu.
A complete copy of the *Student Code 2017-2018* is attached as University Exhibit 1, and a copy of the *Student
Disciplinary Procedures* is attached as University Exhibit 2.  These documents may be considered in that they are
referenced in the Complaint or its exhibits are central to Plaintiffs' claims, and are authentic.  *Santana v. Cook Cnty
Bd. of Review,* 679 F.3d 614, 619 (7th Cir. 2012); *Ware v. Lake Cnty. Sheriff's Office,* 2017 U.S. Dist. LEXIS 33233,
*7, 2017 WL 914755 (N.D. Ill. 2017).  A court may also take judicial notice of a matter of public record.  *Ingenhutt
v. State Farm Inv. Mgmt. Corp.,* 2017 U.S. Dist. LEXIS 58553, *15, 2017 WL 1398646 (C.D. Ill. 2017).

301961412v1 1008237

On December 12, 2017, Dean Die requested each Plaintiff to make an appointment to discuss "a problem involving you and another student."  He also restricted each Plaintiff from having contact with Khan:

> Therefore, I am directing you to have NO CONTACT with Tariq Khan (oral or written, directly or through any third party) until further notice.
>
> . . .

¶¶36, 37. Ex. E (emphasis in original).

On December 13, 2017, Minik went to a 3D printing lab presentation at a campus building.  At the same time, Khan's spouse was at another event at the same building.  ¶¶41, 66.  Because of the no contact directive, the building's director "ordered Minik to leave."  He did so without attending the presentation and without further incident.  ¶42; Ex. G.

Minik met with Dean Die on December 14.  ¶¶38, 30.  Minik summarized that meeting:

> …The [no contact] order was filed by Tarig Khan against me due to messages he received as a result of my coverage of his altercation with two members of my organization, Turning Point USA@UIUC.  This is not a direct disciplinary charge, rather a probationary measure to ensure that I do not attempt to reach out to him personally or through other individuals.  If that is violated, I face suspension from the university.
>
> The order does not pertain to public events on campus. . . .
>
> Lastly, *the no contact order does not prevent me from writing journalistic stories related to Khan.*  However, if I hope for the situation to improve, you *suggest* that I do not write about him anymore. . . .

Ex. F (emphasis added).  Notwithstanding his understanding of the conversation with Dean Die, Minik now feels that Dean Die "threaten[ed] him:  "if Minik did not stop writing about Khan, Die would continue to impose discipline upon Minik."  ¶39.

301961412v1 1008237

**Minik's Facebook Post**

At some point before January 16, 2018, Minik entered a post on Facebook about Khan: "Get him out of here… beat the shit out of him… I'll pay the legal fees."  ¶¶43, 66.  Although Minik claims he was being "sarcastic[]," characterizing it as a "meme of Donald Trump," (¶43) Khan did not perceive it that way.  Dean Die advised Minik that Khan "strongly believes that the meme was posted to encourage violence" toward him and asked Minik for his "personal account on this allegation."  Ex. H.  Even though no discipline ensued, Minik perceives the Dean's actions to be "calculated" to "further chill [Plaintiffs'] expressive and journalistic activities." ¶43.

**Nelson's Filming Khan**

On February 22, 2018, Khan's group held a protest at an Illini basketball game.  Nelson attended the protest in order to film for Campus Reform.  Khan's supporters considered Nelson's presence to be a violation of the no contact directive and reported it. (¶45).  Dean Die sent an email to Nelson, dated February 26, 2018, (¶44) noting that Khan's supporters:

> *alleged* that on February 22, 2018, you were involved in an incident which may violate the Student Code. . .  It is *alleged* that you violated the No Contact Directive that was issued between you and another student.  Such conduct, *if proven,* would fall within the jurisdiction of the student discipline system . . .

Ex. I (emphasis added).  Dean Die requested to meet with Nelson "to discuss the nature of the incident and the appropriate University response."  *Id.*

The Dean later advised Nelson that the no contact directive did not apply to public places and that no discipline would follow.  ¶46.  Nelson was not satisfied.  He complains that Dean Die neither rescinded his February 26 email (Ex. I) nor apologized for issuing it "without cause."  Nelson considers that email to constitute a threat against his expressive and journalistic activities.  ¶46.

5

**<u>Valdez's Facebook Post</u>**

On November 21, 2017, an unidentified person posted on Facebook a message to Valdez regarding Khan:

> "Joel M. Valdez I'll beat his ass for you bro [Emoji with smiley face puffing air]."

¶54; Ex. J.  Valdez responded by "liking" the post and directing the poster to "Do it ASAP." ¶54; Ex. J.

Dean Die met with Valdez on January 30, 2018, to address this incident.  Ex. J.  After he reviewed all information, Dean Die advised Valdez on February 26, 2018, that:  "I find you in violation of rule(s) in Section One of the Student Code.  Student Code/1302…."  Ex. J; ¶56. (That rule prohibits "[i]nciting, aiding, or encouraging others to engage in a behavior which violates the Student Code.")   As a result, Valdez was issued a University Censure[3] and was directed to complete a 1000-word paper "reflecting on [his] actions in this incident."  Ex. J; ¶56. Valdez was informed of his right to appeal the action.  Ex. J.

Valdez chose not to write the paper,[4] (Ex. K) contending that doing so would compel him to make false admissions which could later be used against him.  ¶¶57, 58, 82.  As a consequence, "a disciplinary hold" was placed on Valdez's account, preventing Valdez from viewing grades, registering for classes, and graduating pending completion of the essay.  Ex. K; ¶59.

---

[3]     A University Censure is not recorded on a student's academic transcript and is not released to others. University Ex. 2, §2.04(b)(2).

[4]     No allegation is included regarding whether Valdez appealed the discipline.

301961412v1 1008237

**Allegations that Nelson Violated the No Contact Directive**

On April 4, 2018, Dean Die emailed Nelson advising that "[i]t is alleged that you violated the No Contact Directive that was issued between you and another student.  You did this by deliberately following and filming the student at multiple events that occurred on February 22nd, 26th, and 27th of 2018."  Ex. L; ¶60.  The alleged violations were for failure to obey a directive issued in the disciplinary process and failure to obey reasonable directions of a University official acting in the performance of his or her duties.  A hearing on the allegations was set for April 13, 2018.[5] ¶64; Ex. L.

**Allegations Against President Killeen and Chancellor Jones**

The Complaint describes no direct role of either President Killeen or Chancellor Jones in any of the events with Plaintiffs.  Relief is sought from them because they:  1) have not provided criteria for the issuance of no contact directives (¶50); 2) granted "unbridled discretion" to disciplinary officers in issuing no contact directives (¶51); 3) knew or should have known that the policies, codes, and practices of the University were unconstitutionally vague and overbroad (¶62); 4) knew or had reason to know that Dean Die was unconstitutionally enforcing the University's policies, codes, and practices (¶63); and 5) "continue to impose and direct enforcement of the facially invalid student code" (¶116A).

## STANDARD OF REVIEW

The Eleventh Amendment is a jurisdictional bar to suits against a state in federal court. *Gehrt v. University of Illinois at Urbana – Champaign Coop. Extension Serv.,* 974 F.Supp. 1178, 1190 (C.D. Ill. 1997).  In a facial challenge to subject matter jurisdiction under Rule 12(b)(1), the court examines the allegations in the complaint to determine if the plaintiff has sufficiently

---

[5]     After the filing of this suit, the parties agreed to continue generally Nelson's disciplinary hearing.

301961412v1 1008237

alleged a basis for federal jurisdiction. *Apex Digital, Inc. v. Sears, Roebuck & Co.,* 572 F.3d 440, 443-44 (7th Cir. 2009). Well-pleaded factual allegations are taken as true, and all reasonable inferences are drawn in favor of plaintiff. *In re: Fuidmaster, Inc.,* 149 F.Supp. 3d 940, 945 (N.D. Ill. 2016).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009), *quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, (2007); *Atkins v. City of Chicago,* 631 F.3d 823, 832 (7th Cir. 2011). While factual allegations are accepted as true, "legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not. *Brooks v. Ross,* 578 F.3d 574, 581 (7th Cir. 2009). *See also Kubiak v. City of Chicago,* 810 F.3d 476, 480-81 (7th Cir. 2016).

The complaint, "documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice" can be considered. *Williamson v. Curran,* 714 F.3d 432, 436 (7th Cir. 2013). When an exhibit contradicts allegations in the complaint, "the exhibit trumps the allegations." *Thompson v. Ill. Dep't. of Prof'l Regulation,* 300 F.3d 750, 754 (7th Cir. 2002), *quoting Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 454 (7th Cir. 1998).

# I.     THE UNIVERSITY AND ITS OFFICERS IN THEIR OFFICIAL CAPACITY ARE IMMUNE UNDER THE ELEVENTH AMENDMENT FROM CLAIMS SEEKING REDRESS FOR PAST WRONGS.

## A.     The Scope of the Immunity

As noted, the Eleventh Amendment generally bars actions in federal court against a state, a state agency or arm of the state, and state officials acting in their official capacity. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984); *Council 31 of AFSCME v. Quinn,*

8

680 F.3d 875, 881 (7th Cir. 2012).  There are three exceptions:  1) where Congress validly abrogates Eleventh Amendment immunity; 2) where the state consents to being sued in federal court; and 3) where individual state officials are sued for prospective relief to enjoin ongoing violations of federal law as described in *Ex Parte Young,* 209 U.S. 123 (1908).  *Council 31,* 680 F.3d at 882.

State agencies enjoy the same treatment as states (*Alabama v. Pugh,* 438 U.S. 781-782 (1978)), and state universities are generally found to be arms of the state.  *Regents of the Univ. of Cal. v. Doe,* 519 U.S. 425 (1997).  "[I]t would be an unusual state university that would not receive immunity."  *Kashani v. Purdue Univ.,* 813 F.2d 843, 845 (7th Cir. 1987).  Moreover, university governing bodies enjoy the same immunity.  *Peirick v. Ind. University – Purdue Univ.,* 510 F.3d 681, 695 (7th Cir. 2007);[6] *Kroll v. Bd. of Trustees of Univ. of Illinois,* 934 F.2d 904, 908 (7th Cir. 1991).

Courts have routinely recognized that the University of Illinois, its Board, and its officers in their official capacity enjoy Eleventh Amendment protection.  *Kroll, Id.; Kaimowitz v. Bd. of Trustees of Univ. of Illinois,* 951 F.2d 765, 767 (7th Cir. 1991); *Mutter v. Madigan,* 17 F.Supp.3d 752, 757-58 (N.D. Ill 2014)  No exception to sovereign immunity applies to the Board and to the bulk of the official capacity claims.  1) Congress has not abrogated Eleventh Amendment immunity for §1983 actions.  *Quern v. Jordan,* 440 U.S. 332, 342 (1979); *Thomas v. State of Illinois,* 697 F.3d 612, 613 (7th Cir. 2012).  2) The State has not consented to suit.  *Cannon v.*

---

[6]     In *Peirick,* the court concluded that Indiana University was a state agency because it received state appropriations, it needed state approval for the issuance of bonds, and its board members were gubernatorial appointees.  In the event that the court chooses to reexamine the status of the University of Illinois, the University Defendants note that the University received appropriations from the State representing 29.7% of its unrestricted funds in its 2017 fiscal year and 21% for the fiscal year 2018.  The Governor appoints nine of the Board's twelve members and is an ex officio member.  110 ILCS 310/1.  Its powers are statutorily circumscribed, including its power to borrow.  110 ILCS 305/7.

301961412v1 1008237

*Univ. of Health Sciences / The Chicago Med. School,* 710 F.2d 351, 355 (7th Cir. 1983).  3) The

Board is not amenable to suit irrespective of  the relief sought.  *Puerto Rico Aqueduct & Sewer*

*Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146 (1993).

Although official capacity suites are deemed to be against the "entity of which the officer

is an agent" (*Kentucky v. Graham,* 473 U.S. 159, 165 (1985)), thereby barring damages actions

against them (*Kroll,* 934 F.2d at 907-08), certain claims for prospective relief may proceed.

"[T]he *Ex Parte Young* exception requires a straight forward inquiry into whether the complaint

alleges an ongoing violation of federal law and seeks relief properly characterized as

prospective."  *Sonnleitner v. York,* 304 F.3d 704, 718 (7th Cir. 2002) (internal quotation marks

omitted).

In *Sonnleitner,* the plaintiff brought a §1983 action claiming that he was demoted in his

public employment without due process and sought an injunction requiring reinstatement to his

former position.  Although injunctive relief was prospective, the claims pertained to a completed

action rather than an ongoing violation of federal law.  *Id.* at 718.  Consequently, the Eleventh

Amendment barred the action.

### B.        The Effect of the Immunity on This Action

The Board and the University officials in their official capacity are immunized from

damage claims.  Any relief relating to completed conduct is similarly barred.  Consequently, this

Court may not enter a declaratory judgment relating to alleged past due process violations such

as the initial issuance of the no contact directives and other completed actions about which

plaintiffs complain.   Allegations of ongoing First Amendment violations, however, are not

barred.  *Salaita v. Kennedy,* 118 F.Supp.3d 1068; 1091 (N.D. Ill. 2015).

301961412v1 1008237

## II.   NEITHER THE BOARD NOR THE UNIVERSITY OFFICIALS IN THEIR OFFICIAL CAPACITY ARE "PERSONS" UNDER SECTION 1983.

In addition to the bar of the Eleventh Amendment, the Board and the officials in their official capacity, excepting actions for prospective relief from ongoing violation, are not "persons" under §1983.  *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 66 (1989); *Snyder v. King,* 745 F.3d 242, 247 (7th Cir. 2014).  *Joseph v. Bd. of Regents*, 432 F.3d 746, 748 (7th Cir. 2005).  Accordingly, the Board must be completely discharged from this matter, and the claims against the University officers in their official capacity for damages and other relief for completed actions must be dismissed.

## III.   THE COMPLAINT FAILS TO SHOW ANY PERSONAL INVOLVEMENT OF PRESENT KILLEEN, CHANCELLOR JONES, OR ANY INDIVIDUAL BOARD MEMBER.

Notwithstanding that suit is against them in their official capacities, Plaintiffs seek damages, including exemplary damages, from the Board, President Killeen, and Chancellor Jones.  ¶77; Prayer, par. C.  *See Miller v. Smith,* 220 F.3d 491, 494 (7th Cir. 2000) ("where the plaintiff alleges tortious conduct of an individual acting under color of state law, the defendant has been sued in her individual capacity").  Claims against President Killeen, Chancellor Jones, and all Board members must be dismissed due to the lack of any fact allegation that they caused or participated in an alleged constitutional deprivation.

"Section 1983 creates a cause of action based upon personal liability and predicated upon fault.  An individual cannot be held liable in a §1983 action unless he caused or participated in [t]he alleged constitutional deprivation." *Galdikas v. Fagan,* 342 F.3d 684, 693 (7th Cir. 2003), *abrogated on other grounds by Spiegla v. Hull,* 371 F.3d 928, 941-42 (4th Cir. 2004).  Liability cannot be imposed merely based upon one's supervisory role.  To be liable for the conduct of a subordinate, a supervisor must have been personally involved in the conduct; he or she must

301961412v1 1008237

have known about the conduct and "facilitate[d] it, approve[d] it, condone[d] it, or turned a blind eye for fear of what [he or she] might see." *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir. 1988); *Matthews v. City of E. St. Louis,* 675 F.3d 703, 708 (7th Cir. 2012).  A supervisor who was merely negligent or grossly negligent in failing to detect or prevent a subordinate's misconduct is not liable.  The supervisor must have acted either knowingly or with deliberate, reckless indifference.  *Jones,* 856 F.2d at 992-93.

In the matter *sub judice,* there are no allegations pertaining to the conduct of any Board member.  With respect to President Killeen and Chancellor Jones, the most that can be said is that there are allegations of mere negligence:  a) they have not provided criteria for the issuance of a no contact directive (¶50); b) they gave Dean Die unbridled discretion in issuing no contact directives (¶51); and c) they "knew or should have known" that the *Student Code* was overbroad (¶62) and that Dean Die was unconstitutionally enforcing it (¶63).  The Complaint fails to state a claim against President Killeen, Chancellor Jones, and the Board members in any individual capacity claim.

## IV.    THE COMPLAINT FAILS TO STATE A CLAIM FOR ANY CONSTITUTIONAL VIOLATION.

Counts I and II of the Complaint purport to set forth First Amendment claims under the freedom of the press clause and freedom of speech clause, respectively, and Count III comprises procedural and substantive due process claims,[7] pertaining to the no contact directives and the

---

[7]    It is unclear if Plaintiffs are asserting a §1983 conspiracy.  They allege that Dean Die conspired with Khan "to impose discipline" (¶35) and "to harass the [Plaintiffs] and chill their First Amendment rights" (¶69).  The Complaint, however, "is bereft of any suggestion, beyond a bare conclusion" of a conspiracy.  *Cooney v. Rossiter,* 583 F.3d 967, 971 (7th Cir. 2009).  "[M]ere suspicion that persons adverse to the plaintiff had joined a conspiracy against him or her [is] not enough."  *Id.;*  If Plaintiffs are asserting a claim for conspiracy, it must be dismissed.

301961412v1 1008237

alleged "facially invalid provisions of the Student Code."   ¶116A.   As a matter of law, the Complaint presents no claim for any constitutional violation.

A.        **There Has Been No Unconstitutional Restriction on the Press.**

Plaintiffs contend that the no contact directives and Dean Die's actions were "motivated by an intention to chill or prevent [plaintiffs] from reporting on Khan's campus activities" (¶88) and that Plaintiffs' freedom of press rights have been restricted (¶¶88, 92).  Their Complaint fails to sustain these claims.

The First Amendment's proscriptions against abridging the freedoms of speech and press are applicable to the State's through the Fourteenth Amendment.  *Reed v. Town of Gilbert,* _____ U.S. _____, 135 S.Ct. 2218, 2226 (2015).  Although news gathering and reporting is protected, "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news."  *Dahlstrom v. Sun-Times Media, LLC,* 777 F.3d 937, 946 (7th Cir. 2015), (internal citation omitted).  The press "has no special privilege to invade the rights and liberties of others."  *Branzburg v. Hayes,* 408 U.S. 665, 683 (1972).

In *Dahlstrom*, the court reviewed whether the Driver's Privacy Protection Act (DPPA), 18 U.S.C. §2721 *et seq.,* violated the freedom of the press clause.  The DPPA prohibits persons from knowingly obtaining and disclosing personal information from state motor vehicle records. The Court rejected the Sun-Times contention that the statute interfered with its right to gather information:

301961412v1 1008237

2:18-cv-02101-CSB-EIL   # 10   Page 14 of 27

> It can hardly be said that this targeted restriction renders Sun-Times' right to publish the truthful information at issue here – much of which can be gathered… from other lawful sources… - "largely ineffective."   Further, in forbidding only the act of peering, into an individual's personal government records, the DPPA protects privacy concerns…

777 F.3d at 948.

With regard to the proscription of publishing the protected information, the court noted that its review "hinge[d] on whether the regulation is content based, which requires strict scrutiny, or content neutral, which demands only an intermediate level of review…." *Id.* at 949. "[T]he principal inquiry in determining content neutrality… is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." *Id.* at 950, *quoting ACLU v. Alvarez,* 679 F.3d 583, 603 (7th Cir. 2012).  Concluding that the DPPA's goals were "unrelated to the content of [the regulated] expression," the court found the DPPA to be content neutral. *Id*. at 950.

A content neutral regulation does not transgress the First Amendment if it:

> furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on the alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 952, *quoting Turner Broad. Sys. Inc. v. FCC,* 512 U.S. at 622, 662 (1994).  No First Amendment trespass was found.  The DDPA's prohibition served the governmental interests of removing an incentive to unlawfully obtain the information and to minimize the harm to persons whose private information was obtained (*Id.* at 952); it was unrelated to the suppression of free expression; and it was tailored so that any encroachment was limited to the extent necessary to advance the government interests.  *Id.* at 954.

301961412v1 1008237

In the matter *sub judice*, there has been no unconstitutional restriction of either gathering or reporting news.  The targeted restriction in contacting Khan does not prevent Plaintiffs from gathering information about him and his activities from other sources and in no way interferes with their right to publish that information.  Rather, it advances the University's interests in preventing further altercations that disrupt the work and discipline of the school and in protecting other students.  *See Tinker v. Des Moines Independent Comm. Sch. Dist.,* 393 U.S. 503, 513 (1969); *Healey v. James,* 408 U.S. 169, 184 (1972); *In re FACTOR VIII OR v. CONCENTRATE BLOOD PRODS. LITIG.,* 25 F.Supp. 2d 837, 842 (N.D. Ill. 1998) ("It is not unconstitutional to prohibit harassing conduct, even if that conduct involves verbal components, (internal citation omitted)).

Plaintiffs acknowledge that there has been no restriction on their ability to publish. Minik wrote:  "Lastly, the no contact order does not prevent me from writing journalistic stories related to Khan."  Ex. F.  The Dean's suggestions on how Minik could "improve" the situation (¶39) hardly constitutes a restriction.

The Complaint contains nothing from which to infer that the no contact directives were content based.  Rather, they were reasonable, precautionary restrictions designed to prevent future altercations.  Although the no contact directives did not impermissibly encroach on First Amendment rights, to the extent there was any encroachment, it was limited as necessary in furtherance of the University's legitimate interests.  There has been no unconstitutional transgression on Plaintiffs' rights to gather and publish news.

**B.    There Has Been No Unconstitutional Restriction on Freedom of Speech.**

Plaintiffs also contend that their First Amendment right to free speech has been violated. Specifically, they assert that:  1) they have been subjected to retaliation for exercising speech

301961412v1 1008237

(¶¶99, 100, 103); 2) the no contact directives are impermissible restrictions of their free speech rights in a public forum (¶106); and 3) the *Student Code* is facially invalid as overbroad. (¶¶104, 105, 108).  None of the Plaintiffs' claims withstands scrutiny.

Public "universities are not enclaves immune from the sweep of the First Amendment." *Healy,* 408 at 180; *Nelson v. Moline School Dist.,* 725 F.Supp. 965, 969 (C.D. Ill. 1989) ("Students do not shed their constitutional rights at the schoolhouse gate," *quoting Tinker,* 393 U.S. at 506).  At the same time, a university has the "undoubted prerogative to enforce reasonable rules governing student conduct…."  *Papish v. Bd. of Curators of University of Missouri,* 410 U.S. 667, 669-70 (1973); *Jucha v. City of North Chicago,* 63 F.Supp.3d 820, 828 (N.D. Ill. 2014), *citing Morse v. Frederick,* 551 U.S. 393, 401 (2007).  In the instant matter, the Complaint demonstrates two salient points:  1) the no contact directives were limited, reasonable precautions taken in furtherance of the University's interest of preventing future altercations; and 2) Plaintiffs have proffered no facts from which it can be inferred that their right to free speech was unconstitutionally impaired.

### 1)    No Retaliation

A prima facie case for First Amendment retaliation requires Plaintiffs to demonstrate:  1) their speech was constitutionally protected or was a matter of public concern; 2) they suffered a deprivation likely to deter free speech; and 3) their speech was at least a motivating factor in the deprivation, a causation inquiry.  *George v. Walker,* 535 F.3d 535, 538 (7th Cir. 2008); *Massey v. Johnson,* 457 F.3d 711, 216 (7th Cir. 2006).  While publishing a news article is protected, comments about Khan's children, his age, and kicking and beating him do not rise to the level of matters of public concern.

16

As noted, the no contact directives and other actions at issue were targeted to further University interests.   As a matter of law, the directives were not constitutional deprivations, any inconvenience resulting from restricting contact with Khan does not equal "an injury of constitutional dimension" and "is insufficiently serious to require pre-deprivation process." *Collins v. Univ. of New Hampshire,* 746 F.Supp. 2d 358, 371 (D. N.H. 2010), *aff'd, 664 F.3d 8 (1ˢᵗ Cir. 2011)* (University's order barring professor from contacting another instructor and banning him from campus was not a deprivation of a protected interest).

Plaintiffs leap to the conclusion that their political viewpoints were a substantial factor in the actions of Dean Die presumably because the actions followed Kahn reporting their conduct to the University, and requesting the directives.   While timing may be some circumstantial evidence in establishing retaliatory motive (*Massey*, 457 F.3d at 717); *Crue v. Aiken,* 204 F.Supp.2d 1130, 1139 (C.D. Ill. 2002)), "the fact that a plaintiff's protected speech may precede an adverse… decision alone does not establish causation." *Mullin v. Gettinger,* 450 F.3d 280, 285 (7ᵗʰ Cir. 2006).

Allegations connecting Plaintiffs' politics to any action of any University Defendant, let alone facts sufficient to raise a plausible inference that political viewpoint discrimination was a substantial factor, are lacking.  One the contrary, Dean Die was interested only in preventing further altercations and harassment of other students.   ¶38; Ex. F (the no contact directive was a "probationary measure to ensure that [Minik] do[es] not attempt to reach out to [Khan]" after he received messages "as a result" of Minik's article).  Plaintiffs have pleaded themselves out of court regarding retaliatory motive. *Tamayo v. Blagojevich,* 526 F.3d 1074, 1086 (7ᵗʰ Cir. 2008) ("A plaintiff pleads himself out of court when it would be necessary to

301961412v1 1008237

contradict the complaint in order to prevail on the merits."  (Internal quotation marks and citation omitted)).  No First Amendment retaliation claim is presented.

2)        **No Unreasonable Regulation of Speech**

Plaintiffs contend that their speech in a public forum has been unconstitutionally restricted.  *See, e.g.,* ¶106.  Again, that contention lacks merit.

A blanket restriction on speech in a public forum is not permissible under the First Amendment.  Any restriction must be reasonable in time, place, and manner.  *Surita v. Hyde,* 665 F.3d 860, 870 (7th Cir. 2011) ("Government may enforce reasonable time, place, and manner restrictions provided that they are content neutral, they are narrowly tailored to serve a significant government interest, and ample alternative channels of communication exist.").

As addressed in the freedom of press section above, the no contact directives and other actions at issue were content neutral, focused on legitimate interests of the University, and were narrowly tailored to prohibit only contact with Khan.  The Complaint shows that the no contact directives did not apply to public places (¶38) and that there was no restriction on writing articles – even those relating to Khan.  Ex. F.

There has been no unconstitutional restriction of Plaintiffs' First Amendment rights – neither freedom of the press nor freedom of speech.

3)        **No Invalid Regulations**

Plaintiffs also contend that the provisions of the *Student Code* at issue are facially invalid as overbroad and vague.  ¶¶62, 75, 84, 116A.  With respect to the no contact directives, they assert that there is no criteria to guide their issuance, leaving a disciplinary officer with "unbridled discretion" to issue them. ¶¶51, 105.

18

Under the First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech. *United States v. Stevens,* 559 U.S. 460, 473 (2010); *United States v. Williams,* 553 U.S. 285, 292 (2008); *Bauer v. Shepard,* 620 F.3d 704, 715 (7th Cir. 2010). Overbreadth also arises where a party's conduct requires official approval under laws that delegate standardless discretionary power to officials. *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973); *MacDonald v. City of Chicago,* 243 F.3d 1021, 1026 (7th Cir. 2001). Because a successful challenge to a statute as facially overbroad forbids any enforcement of it, the challenging party "assumes a heavy burden." *United States v. Johnson,* 875 F.3d 360, 365 (7th Cir. 2017).

### a)      The Student Code is Not Overly Broad

The first step in the overbreadth analysis is to construe the statute; "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Williams,* 553 U.S. at 293; *Johnson,* 875 F.3d at 366. Once properly understood, it is necessary to determine whether a statute prohibits a substantial amount of protected expressive activity. *Williams,* 553 U.S. at 297; *Johnson,* 875 F.3d at 367-68.

Nelson was alleged to have breached the no contact directive in violation of *Student Code* §§1-302(g) and 1-302(o)(1); (Ex. L). Those sections subject students to discipline for "failure to comply with reasonable directions of an agent of the University acting in the performance of his or her duty" and "failure to obey the directive of a disciplinary body…," respectively.

Valdez was found to have violated §1-302(r) of the *Student Code* when he responded, "Do it ASAP" to a Facebook post about beating Khan. Ex. J. That section prohibits, *inter alia,* encouraging others to engage in behavior which violates the Student Code. (Causing

19

or threatening to cause bodily harm or to make one reasonably fear for personal safety are violations of the *Student Code*.  *See* §1-302(a).)

The plain and ordinary meaning of these *Code* sections is unambiguous. Students are required to obey directions emanating from the disciplinary process or from University officials made within the scope of their duties.  Not all directions or orders are covered; the duty to comply is qualified.  With regard to Section 1-302(g), the directions must be reasonable and come from a University official acting in the performance of University duties, and as to Section 1-302(o)(1), the disobedience must be in the context of "[a]buse of the University disciplinary system."  "Statutory interpretation is guided not just by a single sentence or sentence fragment, but by the language of the whole law, and its object and policy."  *CFTC v. Worth Bullion Group., Inc.,* 717 F.3d 545, 550 (7th Cir. 2013).  When viewed in context, the *Student Code* does not reach protected speech.

Similarly, Section 1-302(r) presents no ambiguity.  A student commits a violation if the student encourages another person to violate the Code.

These sections implement standard expectations of student behavior and discipline and reach no further.  The University has authority to promulgate rules and regulations, to properly discipline, and to expect its students to "adhere to generally accepted standards of conduct."  *Healy,* 408 U.S. at 192, *quoting Esteban v. Central Missouri State College,* 415 F.2d 1077, 1089 (8th Cir. 1969).  On the other hand, the First Amendment neither immunizes a student from abiding by reasonable orders from University officials or from directives issued in the disciplinary process nor protects a student's use of speech that threatens or encourages bodily harm to another.  The *Student Code* presents no overbreadth problem.

20

**b)**    **Discretion is Not Unbridled**

Plaintiffs erroneously contend that Dean Die or other disciplinary officers have unfettered discretion in issuing no contact directives.  "[W]here a statute or ordinance vests government with virtually unlimited authority to grant or deny a permit, that law violates the First Amendment's guarantee of free speech."  *MacDonald*, 243 F.3d at 1026; *Constr. & Gen. Laborers' Local Union No. 330 v. Town of Grand Chute*, 834 F.3d 745, 749 (7th Cir. 2016). Limits in the law must be "explicit by textual incorporation, binding judicial or administrative construction, or well-established practice."  *City of Lakewood v. Plain Dealer Pub'g Co.,* 486 U.S. 750, 770 (1988).  A statute must be viewed in context and with respect to its place in the overall statutory scheme.  *See King v. Burwell,* ____ U.S. ____, 135 S.Ct. 2480, 2489 (2015).

As noted above, the directives do not constitute an unconstitutional deprivation of First Amendment rights, but, assuming *arguendo* that when viewed in the context of the University's authority to require students to adhere to a general standard of conduct, those rights are implicated in the school environment (*Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of Law v. Martinez,* 561 U.S. 661, 664 (2010) and the overall disciplinary process, issuing criteria is apparent.

No contact directives are addressed in the *Student Disciplinary Procedures*.  University Ex. 2.  The DO reviews allegations and determines if charges are appropriate.  §2.02(a).  A standard of review guides the DO; he must "determine if it is more likely true than not true that the respondent is responsible for violating the Student Code." §2.02(f).  If that determination is made, the DO may impose restrictions in the student's activities or "contact with specific people or physical locations," *i.e.,* issue no contact directives. §2.04(c)(ii).

21

The law recognizes the "University's right to exclude even First Amendment activities that violate reasonable campus rules or substantially interfere with the opportunity of other students to obtain an education." *Widmar v. Vincent,* 454 U.S. 263, 276-77 (1981). Before he issued the no contact directives, Dean Die knew about the altercation, Minik's article, and the altercation video. ¶37. Kahn complained that he "received [messages] as a result of Minik's coverage" of the altercation. Ex. F. Thereafter, Dean Die issued the no contact directives as precautionary measures designed to limit activities threatening to disrupt the University's educational mission. The issue is not whether Dean Die was correct in making his determinations or whether he should have investigated further; the issue is whether he had unbridled discretion. No contact directives issued under the procedures present no facial overbreadth problem.

### c)      There Has Been No Due Process Violation

Plaintiffs' final claim against the University Defendants purports to be one for violation of their substantive and procedural due process rights. Count III is fatally flawed.

### i)      No Substantive Due Process Violation

Only laws affecting fundamental rights come within the ambit of substantive due process. *National Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1129 (7th Cir. 1995). Fundamental rights are "among those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." *Kraushaar v. Flanigan,* 45 F.3d 1040, 1047 (7th Cir. 1995) (internal quotation marks omitted). Substantive due process protects individuals "from an arbitrary deprivation of their fundamental rights." *See Lee v. City*

301961412v1 1008237

*of Chicago,* 330 F.3d 456, 467 (7th Cir. 2003).   Here, however, no fundamental rights are implicated.[8]

First, there is no fundamental right to post-secondary education. *Hess v. Bd. of Trs. of S. Ill. Univ.,* 839 F.3d 668, 677 (7th Cir. 2016).

Second, speech and press rights are not protected by substantive due process.  "Where a particular amendment [to the Constitution] provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."  *Albright v. Oliver,* 510 U.S. 266, 273 (1994); *Johnson v. Phelan,* 69 F.3d 144, 146 (7th Cir. 1995).  Consequently, Plaintiffs' alleged deprivations of speech and press rights are reviewable only under the First Amendment.

Even if Plaintiffs presented a cognizable right, there can be no violation of substantive due process absent misconduct of government officials that is so outrageous as to shock the conscience.  *Hess,* 839 F.3d at 677.  No conduct of such magnitude is alleged.

### ii)        No Procedural Due Process Violation

Review of procedural due process claims has two components:  1) whether plaintiff was deprived of a protected property or liberty interest; and 2) whether the deprivation was without sufficient procedural protection.  *Galdikus,* 342 F.3d at 691.  Here Plaintiffs claim that their liberty interests in free press and speech have been deprived without

---

[8]        Substantive due process may also protect against the arbitrary deprivation of property interest.  *See Galdikas v. Fagan,* 342 F.3d 684, 689-90 (2003).  Plaintiffs have not asserted any property interest with respect to their substantive due process claim.

notice and opportunity to be heard.   ¶115.   For the reasons set forth above, the no contact directives do not implicate a substantial liberty interest needing due process protection.

Assuming a protected liberty interest is present, the issue becomes "what process is due." *Goss v. Lopez,* 419 U.S. 565, 577 (1975) (internal citation omitted).   It is axiomatic that procedural due process has two requisites, *viz.,* notice and opportunity to be heard. *Id.* at 579.   The process, however, need not be the same with respect to every deprivation. *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976).   The amount of process depends on the weight of the interest, the risk of error, and the costs of additional process.   *Atkins v. City of Chicago,* 631 F.3d 823, 827 (7th Cir. 2011).

In *Haidak v. Univ. of Mass. at Amherst,* 2018 U.S. Dist. LEXIS 38695, 2018 WL 1243956 (D. Mass. 2018), the plaintiff was expelled after he assaulted another student.   The University had previously issued a no contact order barring the plaintiff from contacting the victim.   The plaintiff claimed due process was violated when the no contact order was issued before he had an opportunity to be heard.   *Id.* at 47.   The court first held that a no contact order "does not implicate a substantial property or liberty interest," but if it did, a pre-deprivation hearing was not required because, *inter alia,* an in-person conference promptly after the issuance of the order "to discuss both the underlying charges… and the no-contact order was a sufficient opportunity to contest the complaint against him."   *Id.* at 48.   *See also Perkins v. Univ. of Nebraska,* 2017 U.S. Dist. LEXIS 189255 (D. Neb. 2017) (having conference after student banned from campus sufficient); *Collins,* 664 F.3d 8 (banishment from campus before a hearing was "insufficiently serious to require pre-deprivation process").

301961412v1 1008237

In this matter, Plaintiffs have not presented a deprivation of a substantial liberty interest, but even if they had, the flexible nature of due process was satisfied by the meetings after the issuance of the no contact directives.

## **CONCLUSION**

For the reasons presented herein, the University Defendants pray the Court to dismiss the Complaint against them.

/s/Charles R. Schmadeke
Charles R. Schmadeke (#2489813)
Hinshaw & Culbertson LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
Telephone:  217-528-7375
Facsimile:  217-528-0075
Email: cschmadeke@hinshawlaw.com

*Attorneys for Defendants*

301961412v1 1008237

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing MEMORANDUM OF LAW SUPPORTING UNIVERSITY DEFENDANTS' MOTION TO DISMISS complies with the type-volume limitation specified in Local Rule 7.1(b)(1).  According to the word count of the word-processing system used to prepare this document, there are 6,734 words in this document.


Dated:  /s/June 8, 2018

/s/Charles R. Schmadeke
Charles R. Schmadeke (#2489813)
Hinshaw & Culbertson LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
Telephone:  217-528-7375
Facsimile:  217-528-0075
Email: cschmadeke@hinshawlaw.com

*Attorneys for Defendants*

301961412v1 1008237

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2018, I electronically filed the foregoing MEMORANDUM OF LAW SUPPORTING UNIVERSITY DEFENDANTS' MOTION TO DISMISS with the Clerk of Court using the CM/ECF system and served upon counsel of record:

Noel W. Sterett            Email:  nsterett@mauckbaker.com

Whitman H. Brisky          Email:  wbrisky@mauckbaker.com

Ellyn J Bullock            Email:  ellyn@solbergbullock.com

/s/Charles R. Schmadeke
Charles R. Schmadeke (#2489813
Hinshaw & Culbertson LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
Telephone:  217-528-7375
Facsimile:  217-528-0075
Email: cschmadeke@hinshawlaw.com

27