E-FILED
Monday, 09 July, 2018  05:30:23 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | |
|---|---|
| **ANDREW MINIK, JOEL VALDEZ,** and **BLAIR NELSON,** | |
| Plaintiffs, | |
| vs. | **Case No. 2:18-cv-02101-CSB-EIL** |
| **BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS,** *et. al*., | |
| Defendants. | |

**PLAINTIFFS' RESPONSE TO
DEFENDANTS' MOTION TO DISMISS**

NOW COME Plaintiffs Andrew Minik, Joel Valdez, and Blair Nelson, by and through their attorneys, and respond to Defendants' Motion to Dismiss under Rules 12(b)(1) and 12(b)(6):

**INTRODUCTION**

This is a case about the freedom of expression protected by the First Amendment to the Constitution of the United States, and the actions of the University of Illinois that inhibit and chill the exercise of this right by these Plaintiffs, and by other students who may desire to engage in similar protected activities. These protected activities include observing and making video recordings of, public, political demonstrations and activities engaged in by various individuals and groups including those of Defendant Kahn and the group with which he is affiliated - the Black Rose Anarchist Federation. This right of freedom of expression is critical in the University context so that the free exchange of ideas, even unpopular activities, can occur without threat

from the State of Illinois or its instrumentality, the University of Illinois.[1]  "[S]tudents must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Whitehill v. Elkins*, 389 U.S. 54, 60 (1967). Thus, "free speech is of critical importance because it is the lifeblood of academic freedom." *DeJohn v. Temple Univ.*, 537 F.3d 301, 314 (3d Cir. 2008). Freedom of speech, in particular, has been the subject of several recent United States Supreme Court decisions including *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876 (2018), *Nat'l Inst. of Family & Life Advocates v. Becerra*, 16-1140, 2018 WL 3116336 (U.S. June 26, 2018), *Janus v. Am. Fed'n of State, County, & Mun. Employees, Council 31*, 16-1466, 2018 WL 3129785 (U.S. June 27, 2018) as well as a recent decision from the Illinois Supreme Court, *People v. Relerford*, 2017 IL 121094 and the Wisconsin Supreme Court, *John McAdams v. Marquette University*, No. 2017 AP 1240 (Wis. Jul. 6, 2018)(unpublished order).

## LEGAL STANDARD

In reviewing motions to dismiss under 12(b)(1), "courts apply the same analysis used to review whether a complaint adequately states a claim: '[C]ourts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Silha v. ACT, Inc*., 807 F.3d 169, 173 (7th Cir. 2015). (internal citation omitted). Motions to dismiss for failure to state a claim under 12(b)(6) are generally viewed with disfavor, *Armstrong v. Snyder*, 103 F.R.D. 96, 101 (E.D. Wis. 1984). These motions should not to be used to resolve the merits of the case and can only be granted if the plaintiff has not provided fair notice of its claim and factual allegations that, when accepted as true, are plausible and rise

---

[1] While Plaintiffs were not told that Khan had also been hit with a no contact order, and Khan apparently knew about the order imposed upon the Plaintiffs, the protection of the Constitution must be applied even to repugnant messages. *Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43 (1977). Plaintiffs bring this suit not only to vindicate their own rights, but also to protect the rights of all students to free expression, even Khan's.

2

above mere speculation. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 526 (7th Cir. 2015). Federal Rule 8(a)(2) only calls for "a short and plain statement of the claim showing that the pleader is entitled to relief." Plaintiffs need only plead sufficient facts to show that their claims have "substantive plausibility." *Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (November 10, 2014) (per curiam) citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U. S. 662 (2009).

**I.   Plaintiffs' claims are not barred by the Eleventh Amendment.**

The moving Defendants claim immunity from Plaintiffs' claims under the Eleventh Amendment to the United State Constitution. The Eleventh Amendment generally bars actions in federal court against a state or an agency or arm of the same, including individuals in their official capacity. *Scott v. O'Grady*, 975 F.2d 366, 369 (7th Cir. 1992). This general rule has exceptions including, as relevant here, where individual state officials are sued for prospective relief to enjoin ongoing violations of federal law. *Ex Parte Young*, 209 U.S. 123 (1908). It is unclear whether the Defendants argue that the entire suit is barred by the Eleventh Amendment or whether it is barred only with respect to damages against university officials.

Defendants characterize Plaintiffs' claims as "past due process violations" and "other completed violations," but do acknowledge that ongoing violations are not barred. Dkt. 10, p.10. Defendants also cite to *Sonnleitner v. York*, a Section 1983 suit which sought a mandatory injunction for reinstatement to correct a due process violation in connection with the demotion of a public employee. 304 F.3d 704 (7th Cir. 2002). According to Defendants, that "court held that although the injunctive relief was prospective, the claims pertained to a completed action rather than an ongoing violation of federal law." Dkt. 10, p. 10. Thus, it was the substantive equivalent

of damages for the past violation of due process rather than an injunction to prohibit continuing unconstitutional conduct.

In contrast, the thrust of this Complaint is one for prospective relief from ongoing, not completed, violations of Plaintiffs' First Amendment rights as a result of the continuing penalties, discipline, and restrictions imposed on them including (Dkt. 1, ¶¶ 60, 64, 73), but not limited to, the continued existence of the ambiguous "no contact" orders (Dkt. 1, ¶¶ 36, 74), which by their terms never expire, multiple continuing attempts to discipline Plaintiffs for supposed violations of that order (Dkt. 1, ¶¶ 42-44, 54), the penalties imposed on Valdez, including being prohibited from registering for class for refusing to comply with the University's unconstitutional order that he write an essay expressing the University's opinion rather than his own (Dkt. 1, ¶ 59), and the continuing existence of vague provisions of the student code which can, and have, been used to chill Plaintiffs' First Amendment rights. Dkt. 1, ¶ 84.

While Plaintiffs also seek damages, a form of retrospective relief, damages for assault, battery, and unlawful destruction of property, relate to Khan's actions who has been sued in his individual capacity (as well as his official capacity), thereby making those damages recoverable. To the extent that Plaintiffs seek damages for violation of constitutional rights, Plaintiffs request, in the interest of judicial economy, to amend their Complaint on its face to include suit against all other Defendants in their individual capacities as well.[2] As alleged in the Complaint (*Id.* at ¶ 63), Defendants Killeen and Jones were aware of the unconstitutional policies and supervised the enforcement of the same. The University Board of Directors also had knowledge of the policies and promulgated the unconstitutional Student Code. *Id.* at ¶¶ 77-78. In fact, the Student Code specifically provides that the Board delegates authority to discipline students and that the

---

[2] Plaintiffs concede that they cannot collect damages against the University or its Board of Directors, but may collect damages against the University Defendants in their individual capacities.

regulations were formulated by "a variety of sources" including "the Chancellor, the President, and the Board of Trustees." Student Code § 1-301. All authority and responsibility of the individual Defendants in this matter was delegated by the Board. *Id.* at ¶ 24. In sum, the Board has promulgated a clearly unconstitutional policy and has permitted its enforcement, Killeen and Jones have carried it out, and Die has enforced the same. All Defendants are "persons" under Section 1983 and the damages claims are proper in their individual capacities.[3] And because this suit is primarily one for prospective relief from ongoing federal violations, the claims for injunctive relief for the continuing violations of constitutional rights are also proper.

### II.   Plaintiffs have properly stated a freedom of the press claim.

A.   Plaintiffs have properly stated a freedom of the press claim that is plausible on its face.

Plaintiffs have done more than required to put Defendants on notice of a plausible freedom of the press claim. The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. Amend, I. Freedom of the press necessarily includes "news gathering" because "without some protection for seeking out the news, freedom of the press could be eviscerated."*Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). Our highest court has held that "state colleges and universities are not enclaves immune from the sweep of the First Amendment" and its "precedents . . .  leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on

---

[3] None of the Defendants are entitled to qualified immunity because Plaintiffs have alleged sufficient facts showing Defendants violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Stinson v. Gauger*, 868 F.3d 516, 522 (7th Cir. 2015). "While the plaintiff does not have to present a case with an identical factual situation, the plaintiff must show legal authority making it apparent that in the light of pre-existing law a reasonable official would have known that the conduct in question violated the constitutional right at issue." *Lundstrom v. Romero*, 616 F. 3d 1108, 1118-1119 (10th Cir. 2010). As discussed in the arguments below, Plaintiffs' claims demonstrate that a reasonable official would have known that the restrictions on Plaintiffs violate constitutional rights.

college campuses than in the community at large." *Healy v. James*, 408 U.S. 169, 180 (1972). These treasured freedoms are precisely what Plaintiffs have alleged — which for the purposes of a motion to dismiss are taken as true — that the Defendants have violated.

The Complaint has alleged that Plaintiffs are campus journalists and correspondents for an organization that reports on higher education. Dkt. 1, ¶¶ 11-14. The Complaint describes how Die issued a no contact order, without notice or hearing, on Minik simply because Minik published a story about Khan's assault. *Id.* at ¶ 37. The Complaint further describes how Die informed Minik that if he wanted "the situation to improve" he should stop writing about Khan, a chilling warning against future reporting. *Id.* at ¶ 39.

Plaintiffs also described how their freedom of inquiry and their ability to gather news have been restricted. Although Die claimed that the orders would not apply to public places, the orders themselves contain no such limitation and have been enforced otherwise. Die informed Nelson that his attendance at three public events, which Nelson attended to film as a campus journalist, would violate his no contact order if proven. *Id.* at ¶¶ 44-45. The events Nelson attended were public, including a protest regarding the University's mascot and a protest by the Graduate Employees' Organization union. In each case, Nelson's ability to attend, inquire, and gather news was impeded as a result of the no contact order. Minik was even removed from a public printing lab presentation by a University employee simply because Khan's wife, not Khan himself, was in another part of the same building, thus demonstrating the University's expansive interpretation of the no contact order. *Id.* at ¶ 41.

Moreover, the Complaint describes the constant fear Plaintiffs have about potentially violating their orders (*Id.* at ¶ 76), how Plaintiffs can no longer walk about campus freely (*Id.* at ¶ 70), the chilling affect the orders continue to have (*Id.* at ¶ 80), the University's monitoring of

Plaintiffs' social media (*Id*. at ¶¶ 43, 54), the reluctance to publish any more articles (*Id*. at ¶¶ 65-67), and the overall inability to engage in protected journalistic activities. *Id*. at ¶ 73. Plaintiffs have done more than enough to plead a valid cause of action that Defendants have violated their freedom of the press.

      B.  <u>Defendants' arguments are without merit.</u>

          i.  The *Dahlstrom* case is distinguishable from the one at hand.

Defendants' argument in response to the freedom of press claim relies heavily on one case, *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937 (7th Cir. 2015), which they discuss and analyze at length. Defendants, however, do not bother to explain how *Dahlstrom* applies here. In *Dahlstrom*, the Sun-Times challenged the Driver's Privacy Protection Act which prohibited obtaining and disclosing personal information from state motor vehicle records. *Id*. The court ruled against the Sun-Times holding that the act properly protects against "peering, into an individual's government records" thereby protecting "privacy concerns." 777 F.3d at 948. But this is not even remotely applicable here. Plaintiffs have not sought, and do not seek, to obtain private information, much less to "peer" into anyone's government records. On the contrary, Plaintiffs have been chilled and restricted in their ability to cover *public* stories and attend *public* events to gather news and take videos. Plaintiffs are not seeking to publish "protected information" (Dkt. 10, p. 14), but to engage in public discourse and to publish stories about public matters and events based on publically available information.

*Dahlstrom* is also distinguishable on other grounds. The decision relates to content neutral regulation restricting access to private "protected information," and government records which is inapplicable here. The restrictions on Plaintiffs here are content based restrictions, *i.e*. not Khan. The Supreme Court has explained that a "regulation of speech is content based if a law applies to

particular speech *because of the topic discussed* or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227 (2015). (emphasis added). Defendants here have informed Plaintiffs that their situation will not improve unless they stopped publishing on one topic — Khan. Minik was not issued a no contact order and warned against future publishing on all topics, for that would be absurd. Minik has been chilled and restricted *because of the topic discussed*, namely Khan. Likewise, the University has not restricted Plaintiffs' ability to attend and cover all public events, but only those in which Khan is present. The regulations imposed on Defendants are content based and are "presumptively unconstitutional" being subject to strict scrutiny. *Id.*

Finally, the case here involves greater restriction on the ability to seek and gather news than was the case in *Dahlstrom*, which involved a limitation on only one source of information, protected confidential public records. Plaintiffs here have been chilled and restricted in their ability to gather and seek news based on *any* firsthand reporting. Defendants, in fact, concede this point arguing that Plaintiffs can gather information about Khan and his public activities "from other sources." Dkt. 10, p. 15. But this incredible statement only proves the point that Plaintiffs are so restricted from engaging in journalistic activities, that they must rely on others to be journalists in order for them to even have a story to publish. Because Defendants have so restricted and chilled Plaintiffs' ability to seek and gather the news, Plaintiffs freedom of press rights have been violated regardless of whether the restrictions are content based.

ii. Defendants' actions do not further a legitimate governmental interest.

Defendants assert that they have a legitimate interest in "preventing further altercations" and "protecting other students" (Dkt. 10, p. 15), but do not cite any case establishing that the University's purported interest permits it to restrict Plaintiffs' journalistic activities. Defendants'

8

reliance on *Tinker* is misplaced because *Tinker* did not involve restrictions on press in a State university but rather restrictions on wearing black arm bands in high school. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 504 (1969). Moreover, the Supreme Court there ruled in favor of the students' free speech claim. Likewise, *Healey* involved the denial of recognition of a student group, not press restrictions. 408 U.S. at 192. And while the court acknowledged that colleges have an interest in "preventing disruption" which may permit restraints, the court also noted that colleges have a "heavy burden" to show the appropriateness of that restraint. *Id*. at 184. There too, the college lost. The *Blood Products* case cited by Defendants is even more irrelevant. That case has nothing to do with schools or restrictions on press but was a suit by hemophiliacs against a nonprofit that provided information about blood products in the 1980s. *In re Factor VIII or IX Concentrate Blood Products Litig*., 25 F. Supp. 2d 837, 839 (N.D. Ill. 1998). When it comes to restrictions on press, even the most important of interests, such as national security, have been found lacking. *New York Times Co. v. United States*, 403 U.S. 713, 723 (1971).

Moreover, the only violence perpetrated in this case was violence by Khan. The University's purported interest is not furthered by punishing or restricting the victims of a violent attack or the chilling of their First Amendment rights.

    C.  <u>Defendants ignore the proper standard on a motion to dismiss.</u>

To survive a motion to dismiss for failure to state a claim, Plaintiffs need only demonstrate that they have put Defendants on notice of a plausible claim. See *supra*, p. 2.  Although Defendants' motion purports to be one under 12(b)(6), the motion says very little, if anything, about whether Plaintiffs have properly pled their cause of action. In fact, the Defendants do not identify any defect in the pleading that would warrant dismissal under 12(b)(6). Instead,

Defendants primarily argue that the restrictions are content neutral and reasonable to further a legitimate interest. While these arguments may become relevant in the future, they do not address whether Plaintiffs have sufficiently stated a claim.

### III.  Plaintiffs have stated a valid freedom of speech claim.

#### A. Defendants retaliated against the Plaintiffs.

Although Plaintiffs' free speech claims are not limited to retaliation, and stand even if imposed without retaliatory intent, Defendants assert that the elements of a retaliation claim are (i) that the speech in question is constitutionally protected or was a matter of public concern, (ii) that the plaintiffs suffered a deprivation likely to deter free speech; and (iii) that the speech was at least a motivating factor in the deprivation. Dkt. 10, p.16. That standard, however, is in the public employee context and inapplicable here.

The test for retaliation for a "private citizen, on the other hand, must show: (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right. Unlike a public employee, speech of a private citizen 'need not have been on matter of public concern for it to fall within the protection of First Amendment.'" *Everitt v. DeMarco*, 704 F. Supp. 2d 122, 129–30 (D. Conn. 2010). (internal citation omitted). In the words of the Seventh Circuit, "to establish a First Amendment retaliation claim, the plaintiff must establish that he engaged in protected First Amendment activity, suffered a deprivation that would likely deter future First Amendment activity, and the First Amendment activity was a motivating factor in the defendant's decision to take the retaliatory action." *Walker v. Groot*, 867 F.3d 799, 803 (7th Cir. 2017).

1. <u>Plaintiffs' activities are protected by the First Amendment.</u>

Plaintiffs' presence and activities at Khan's demonstration, including the carrying of a picket sign and their response to Khan's comments directed to them, was certainly protected activity, as was Minik's publication covering Khan's attack. Likewise, Plaintiffs' journalistic activities, discussed above, are no doubt protected First Amendment activity. Because these activities all constitute interests protected by the First Amendment, Plaintiffs easily satisfy this element.

2. <u>Plaintiffs suffered a deprivation deterring future First Amendment activity.</u>

Plaintiffs have suffered multiple deprivations, all of which have deterred, and continue to deter First Amendment activity. Minik, for example, was issued a no contact order after he wrote a new article about Khan's attack on his colleagues. Dkt. 1, ¶¶ 36-37. Die then warned Minik that if he wants "the situation to improve" he should stop writing articles about Khan. *Id*. at ¶ 39. Minik was later expelled from a University building simply because Khan's wife was in the same building, thus further warning him against appearing in public places were Khan or his associates may gather. *Id*. at ¶ 42. Even more, Nelson received a letter from Die citing him for violation of his order for covering public events on campus. *Id*. at ¶¶ 44-45. Although no further action has yet been taken, the hearing on the violation could be rescheduled, and the message was clear — you cannot engage in speech activities relating to Khan and his associates. Plaintiffs also had their social media pages monitored (*Id*. at ¶ 54), were warned against protected activities online (*Id*. at ¶ 56) and, with respect to Valdez, directed to write an essay contrary to his own opinion on threat of being rendered ineligible to register for classes in the fall. *Id*. at ¶¶ 57-58. Accordingly, Plaintiffs have stated that they fear engaging in protected activities and constantly worry about not violating their orders. *Id*. at ¶ 70. Plaintiffs' pleading satisfies this second element.

3.   <u>The First Amendment activity was a motivating factor for the retaliatory action</u>.

The no contact orders the University imposed on Plaintiffs were specifically, and expressly, motivated by Plaintiffs' First Amendment activity. These speech restrictions were imposed right after, and because of, two of the plaintiffs' activities at Khan's demonstration and Minik's publication of the news story. Die himself stated that if the Plaintiffs wanted the situation to improve, they should stop writing about Khan. *Id.* at ¶ 39. Likewise, Die's citation against Nelson specifically states that Nelson violated his no contact order because he attended public events on three separate occasions. *Id.* at ¶ 45.

Plaintiffs have adequately demonstrated that all of the retaliation elements are satisfied, and have properly pled their cause of action. Even if the standard for public employees were in effect, which it is not, it is also clear that Khan's public activities advocating for political, economic, and social change, and his activities in connection with organizing a union of public employees, (see *Janus*, *supra* p. 2), are matters of public interest.

**B.**     **Defendants have unreasonably restricted Plaintiffs' speech.**

Defendants argue that the restrictions on Plaintiffs' speech are valid "time, place, and manner" restrictions because they are content-neutral, "focused on legitimate interests," and narrowly applicable to Khan. Dkt. 10, p. 18.   But as explained above, these restrictions are neither content neutral, nor do they further a legitimate governmental interest, nor do they have any connection to time, place or manner. Instead, they focus only on the topic of the speech.

These restrictions are content based because they apply to particular speech *because of the topic discussed* or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227 (2015). (emphasis added). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at

2226. Here, Plaintiffs have been told that for their situation to improve, they should not write on one topic — Khan. Dkt. 1, ¶ 39.  The University has enforced the no contact orders broadly to prevent Plaintiffs from attending public events where Khan is also attending, thus turning Khan into a walking speech restriction. *Id.* at ¶¶ 41, 45. And these restrictions do not further the University's purported interest because instead of protecting the student victims of assault, they have actually punished them. Even more, these restrictions have not been applied narrowly to Khan as Minik was forced out of a public lecture simply because Khan's wife was in the same building. *Id.* at ¶ 41.

 Moreover, the University issued these no contact orders against campus journalists, two of whom were attacked and a third who wrote the story on the attack. As a result of these orders, the University has severely limited the news outlet "Campus Reform" from gathering first hand news on public campus events where Khan might be present.

Furthermore, while the University might raise a defense that the restrictions were reasonable or related to a legitimate public interest, that possibility does not render the Complaint defective. Defendants again fail to demonstrate that Plaintiffs have not put them on notice that the University has implemented content based regulations that are not sufficiently narrow to serve a significant government interest. Defendants cannot identify any defect in the pleading to warrant a dismissal under 12(b)(6).

### C.     The University's regulations are invalid.

**(i) The Student Code is overly broad.**

The relevant parts of the Student Code ("Code") that the University has enforced against the Plaintiffs are, §1-302(g), §1-302(o)(1), and §1-302(r) which provide:

> **§1-302(g)**
> Providing false or misleading information to a member or agent of the University acting in the performance of his or her duty; or failing to comply with reasonable

directions of a member or agent of the University acting in the performance of his or her duty,

**§1-302(o)(1)**
Abuse of the University disciplinary system including, but not limited to: (1) failure to obey the directive of a disciplinary body or University officials in performance of their duties.

**§1-302(r)**
Inciting, aiding, or encouraging others to engage in a behavior which violates the Student Code.

The University cited Nelson for violations of Sections 1-302(o)(1) and 1-302(g) after he attended a public protest at a University basketball game and a graduate teacher's union protest. Dkt. 1, ¶¶ 44-45. Ultimately, Die has not yet pursued additional discipline against Nelson under this citation, but also did not rescind the citation or apologize for it. The citation served as a further threat, chilling expressive and journalistic activities. If these regulations can be interpreted by the University as prohibiting what are clearly protected speech and press activities, they are clearly overbroad and ambiguous rendering them unenforceable. *Mansky*, at 1888-89 (2018).

In fact, none of the terms in §1-302(g) are defined. A student is left without guidance as to what "reasonable directions" are or who ultimately makes this decision. Are reasonable directions, for example, instructions to evacuate a building in an emergency? Or "Don't write about Khan or cover his public events?" If the latter, students, at the whim of University officials, could be deprived of their constitutional rights. It is also unclear as to who is an "agent of the University" for the purposes of this Code. Moreover, Khan himself was and perhaps is an instructor/graduate assistant at the University. If Khan qualifies as an agent of the University, must other students obey Khan's "reasonable" directions at the risk of being disciplined, regardless of the obvious conflict? Nor are students ordinarily in a position to know whether the

orders of a university official are within the scope of their duties. Die himself inconsistently enforced the no contact order, assuring Plaintiffs that it did not apply to public spaces, yet issuing violation notices for incidents that occurred in public spaces. While it only mentions Khan himself, the University enforced it against Minik when Khan's wife, not Khan, was present in a completely separate portion of a public building.

Section 1-302(o)(1) is plagued by the same kinds of defects. Nelson was charged with violating this rule because of the alleged "failure to obey the directive of a disciplinary body or University officials in performance of their duties." Was Die, acting alone, a "disciplinary body" or "University officials?" Further, that disciplinary body, if that was what Die was, issued inconsistent orders, one informing Nelson that the no contact order does not apply to public places and the other charging him with a violation in a public place. Additionally, this rule uses the term "university officials," a term not seen in the previous rule. It is reasonable to anticipate that a student would have difficulty ascertaining which employees have which status, so long as these are left undefined.

Finally, Valdez was charged with violating Section 1-302(r) when he liked and commented on a Facebook post left by a friend of his who does not attend the University. The Code prohibits a student from encouraging others to engage in behavior that would violate the Code. However, any behavior that violates the Code must come from a student of that University who is subject to the Code. Section 1-301(c) of the Code states:

> Individuals subject to student discipline include, but are not limited to, all persons:
>
> (1) Taking courses at the University;
> (2) Who cancel, withdraw, or graduate after committing behavior which may violate the code;
> (3) Who are not officially enrolled for a particular term but have continuing relationship with the University; and
> (4) Who have been notified of and accepted their admission

> This definition includes but is not limited to individuals between academic terms and persons who consent to participle in the student disciplinary process. §1-301(c).

Because Valdez's friend is not a student, and none of the §1-301(c) provisions apply to him, he could never engage in behavior "which violates the Student Code." Thus, Valdez cannot be said to be encouraging his friend to engage in behavior which violates the Code. Die charged Valdez erroneously because of the overbroad nature of these codes. Furthermore, a mere Facebook post would be protected activity preventing the poster from being disciplined by the State or its instrumentality, the University. And clearly, liking that post is also protected. Thus, the University's potential, and actual, interpretation of the Code involved prohibition of protected speech activities.

Because these terms are undefined and the enforcement of the Code inconsistent and unconstitutional, Plaintiffs have sufficiently pled that the Code is overbroad. In *Mansky*, the plaintiffs there did not have to show that the law prohibiting clothing carrying a political message had been enforced to chill or prohibit protected speech, it was enough that, because of its ambiguities, it could be so enforced. In this case, we do not have to guess, because that is just how they were used. *Mansky*, at 1888-1890.

### (ii) Discretion is unbridled.

Defendants' argument here is self-defeating. They attempt to show that the Code does not grant unbridled discretion by citing to a second set of codes known as the "Student Disciplinary Procedures" ("Procedures"). But the very provisions Defendants cite show the opposite.

To begin, Defendants cite to Section 2.02(a) of the Procedures which states that "[a]ll concerns about violations of the Code will be referred to a DO. The DO will review the allegations and select the appropriate charges to be considered, if any." The rule thus gives one person full discretion in deciding which charges to bring. Given the vague nature of the Code,

16

those charges could be anything. Next, §2.02(b) states that that same person "will issue a charge letter which shall inform the respondent of the approximate date, location, and type of incident, as well as of the section(s) of the Code that have allegedly been violated. The DO will encourage the respondent to schedule an appointment to discuss the matter." §2.02(b). At this point, the DO has picked the charge to be filed, sent a notice to the student of the charges, and the best the student gets is an option to attend a discussion with this same person. If the student agrees to meet the DO, §2.02(c) allows the DO to explain in person what the notice already says, it does not require the DO to record the student's objections or thoughts. The next step is §2.02(d), where the DO has complete discretion "to make a finding of fact and decide whether it is more likely true than not true that the respondent's conduct constitutes a violation of the Student Code." *Id.*

Thus, the DO in his sole discretion decides whether the student violated the Code, but this rule does not tell the DO how to come to this determination. Thus, one person, with no standard, interprets what the vague Code means and then accuses a student of violating that Code. The same person then acts as prosecutor, jury, and judge, with no checks on *how* the DO should act. The words of §2.02(d) make it clear that the DO "has the authority to make a finding of fact…" but does not guide the DO in how to properly utilize that authority.

Further, if a student contests these allegations, he must do so in writing per §2.02(e), only then in §2.02(f) will the DO consider "all information received and *may* (emphasis added) conduct further investigation to determine if it is more likely true than not true that the respondent is responsible for violating the Student Code. The DO *may* (emphasis added) forward a matter to a subcommittee before reaching a finding and sanctioning decision." *Id.* The DO does not *have to* do these things, but is again given complete discretion, with no guidance as to when

it should be done. The Code does not compel him to conduct further investigations in light of new information submitted by the student, nor does it compel him to reach out to a committee, it only provides the option to do so.

Finally, § 2.02(g) states that "[t]he DO is authorized to make a finding of fact, determine violations of code, and assign *any* disciplinary sanction, education sanction, or restriction . . . ." *Id.* Once more, one person acts as interpreter, accuser, prosecutor, jury, judge, and now, executioner, with limitless discretion. Moreover, § 2.04, which lists the types of punishments available, is not exhaustive. The first sentence states that "actions include, *but are not limited to* (emphasis added), the following:" and then proceeds to list the actions. Therefore, the DO can not only choose any one of the listed actions, but is also authorized to fabricate any punishment he sees fit. Absent the 8th Amendment, the language is broad enough to encompass hanging, drawing and quartering, or perhaps confinement to the stocks. In particular, §2.04(c)(ii) states that the DO may restrict that student from "certain activities on campus" and then provides examples, one of which is "other restrictions deemed [by the DO] just and appropriate." *Id.* This broad language could and has opened the door to a host of restrictions infringing on students' constitutional rights. Because these regulations vest the State with virtually unlimited authority and discretion to potentially regulate speech, these rules are unconstitutional. *See City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988).

**D.   Defendants have violated the compelled speech doctrine.**

Plaintiffs have also alleged that the University has required that Valdez write an essay expressing the University's opinion rather than his own (Dkt. 1, ¶ 57) and that this was "an attempt to compel Valdez's written communication of things with which he did not agree and

18

required false admissions . . . ." *Id.* at ¶ 58.[4] The Supreme Court has just recently held that "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus* 2018 WL 3129785, at *9. "Whenever the . . . State prevents individuals from saying what they think on important matters or compels them to voice ideas with which they disagree, it undermines these ends. When speech is compelled, however, additional damage is done. In that situation, individuals are coerced into betraying their convictions." *Id.* See also *Nat'l Inst. of Family & Life Advocates v. Becerra*, 16-1140, 2018 WL 3116336 (U.S. June 26, 2018)(striking down law requiring pro-life pregnancy centers to promote or advertise the services of abortion providers).

### IV. Defendants' restrictions violate Plaintiffs' Due Process[5].

### A.  Defendants' vague policies provide no criteria for the disciplinary officer.

The Complaint alleges that the Code and the disciplinary policies violate Plaintiffs' right to procedural due process because they are unconstitutionally vague and permit arbitrary, discriminatory, and overzealous enforcement. The Due Process Clause prohibits government from censoring speech pursuant to vague standards. A regulation is void-for-vagueness if it "forbids or requires the doing of an act in terms so vague that [students] of common intelligence must necessarily guess at its meaning and differ as to its application." *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997). The Seventh Circuit has stated, "even if a law does not reach a substantial amount of constitutionally protected conduct, it can be found to be impermissibly vague if it fails to define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and it fails to establish standards to permit

---

[4] Defendants do not address this allegation in their motion.
[5] Plaintiffs proceed only under procedural due process, not substantive due process.

enforcement in a nonarbitrary, nondiscriminatory manner." *Fuller ex rel. Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist. 61*, 251 F.3d 662, 666 (7th Cir. 2001). Standards that regulate speech must be "'susceptible of objective measurement,' and 'precision of regulation must be the touchstone.'" *Espinosa v. Rusk*, 634 F.2d 477, 482 (10th Cir. 1980) (quoting *NAACP v. Button*, 371 U.S. 415 (1963)). As explained, the Code language has not been defined with "sufficient definiteness" and does not provide standards to prohibit enforcement in a "nonarbitrary, nondiscriminatory manner."

Without any objective criteria as to what expressive activities make the students susceptible to liability, Defendants reserve for themselves the ability to apply the codes on a subjective case-by-case basis. This is made more evident by the Procedures which give the DO complete discretion to decide not only what parts of the Code are violated but what facts are relevant in deciding this. The very existence of this Code chilled, and continues to chill, protected activities.

### B.  Plaintiffs have not been given a proper hearing.

*Dixon v. Alabama State Board of Education*, 294 F.2d 150 (5th Cir. 1961), adopted by the Supreme Court in *Gross v. Lopez*, 419 U.S. 565 (1975), holds that the Due Process Clause applies to tax-supported educational instructions and that process requires notice and some opportunity for hearing.

The Procedures do not provide a student an opportunity for a hearing as required by *Dixon*. Instead, it provides unbridled discretion to the DO to decide whether a hearing is appropriate. §2.02(f). This is inappropriate because it does not guarantee all students a hearing. This essentially makes the DO the gatekeeper to due process guarantees. The court in *Dixon* held that "[b]y its nature, a charge of misconduct . . . depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of the witness. In such circumstances, a

20

hearing which gives the Board of administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved." *Dixon* at 158-159.

Plaintiffs were not given the opportunity to attend a hearing where both sides would be examined in "considerable detail." Because the University's polices, still in effect, do not provide students a right to a hearing, and because Plaintiffs were not, in fact, afforded a hearing before the imposition of the no contact orders, their due process rights have been violated.

## <u>CONCLUSION</u>

**WHEREFORE**, Plaintiffs respectfully request that this Court deny the Motion to Dismiss and grant other just relief.

Dated: July 9, 2018

/s/ Whitman H. Brisky
Whitman H. Brisky (#0297151)
Mauck & Baker, LLC
1 North LaSalle Street, Suite 600
Chicago, IL  60602
Phone: (312) 726-1243 (Main)
Fax:     (866) 619-8661
wbrisky@mauckbaker.com

*Attorney for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 9, 2018, I electronically filed **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system and served upon counsel of record:

Charles R. Schmadeke              Email: cschmadeke@hinshawlaw.com

Ellyn J. Bullock                     Email: Ellyn@solbergbullock.com

/s/ Whitman H. Brisky
Whitman H. Brisky (#0297151)
Mauck & Baker, LLC
1 North LaSalle Street, Suite 600
Chicago, IL  60602
Phone: (312) 726-1243 (Main)
Fax:    (866) 619-8661
wbrisky@mauckbaker.com

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS** complies with the type-volume limitation specified in Local Rule 7.1(b)(1). According to the word count of the word-processing system used to prepare this document, there are 6,565 words in the Response.


Dated: July 9, 2018.

<div style="margin-left:40%;">

/s/ Whitman H. Brisky
Whitman H. Brisky (#0297151)
Mauck & Baker, LLC
1 North LaSalle Street, Suite 600
Chicago, IL  60602
Phone: (312) 726-1243 (Main)
Fax:     (866) 619-8661
wbrisky@mauckbaker.com

</div>